# Exhibit A

*Confidential*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| In re: | § | CASE NO. 18-60526-RBK |
| | § | |
| LITTLE RIVER HEALTHCARE | § | |
| HOLDINGS, LLC, et al., | § | |
| | § | |
| Debtors | § | CHAPTER 7 |
| | § | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | |
| | § | |
| JAMES STUDENSKY, CHAPTER 7 | § | |
| TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | ADV. PRO. NO. 20-06062-RBK |
| | § | |
| v. | § | |
| | § | |
| PEGGY S. BORGFELD, RYAN H. | § | |
| DOWNTON, JEFFREY P. MADISON, | § | |
| AND KEVIN D. OWENS | § | |
| | § | |
| Defendants | § | |

_____

**EXPERT REPORT OF JAMES C. SPINDLER**

**April 14, 2022**

_____

*Confidential*

Contents

I.      Introduction and summary of opinions.................................................................3

   A.     Scope of engagement..................................................................................3

   B.     Summary of opinions .................................................................................3

   C.     Materials received from counsel................................................................6

II.     Constraints on LLC manager behavior with regard to distributions .................6

   A.     Protection of creditors in modern business organizations............................6

   B.     Limitations on distributions in LLCs ..........................................................8

   C.     Fiduciary duties........................................................................................11

   D.     Best practices for conflict transactions.....................................................17

   E.     The economic effect of insolvency ...........................................................20

III.    Activities of Little River managers with regard to distributions .......................22

   A.     Multiple distributions................................................................................22

   B.     Failure to consider current and future liabilities........................................23

   C.     Imprecision in earnings estimates.............................................................25

   D.     The tax distributions were heads-I-win-tails-you-lose ...............................26

   E.     Little River was insolvent at the time of the distributions...........................27

   F.     Little River's managers never sought to or obtained consent .......................28

IV.     Conclusion...................................................................................................28

*Confidential*

## I.     Introduction and summary of opinions

### A.     Scope of engagement

I have been requested to provide this report in the litigation captioned as *James Studensky, Chapter 7 Trustee v. Peggy S. Borgfeld, et al*, Adv. Case No. 20-06062-RBK, currently pending in U.S. Bankruptcy Court, Western District of Texas, Waco Division and in the United States District Court for the Western District of Texas, Waco Division as 6-21-MC-00028-ADA.  In particular, I have been asked to address the typical and customary governance practices of limited liability companies ("LLCs") and the impact of insolvency and the threat of insolvency on those practices.

My expertise extends to the matters discussed in this report.  I am a Professor and the Hart Chair of Corporate and Securities Law at the University of Texas School of Law and a Professor at the University of Texas McCombs School of Business.  My academic research and teaching focus on areas including business organizations, corporate governance, and conflicts of interest.  I also regularly consult in such areas. I hold an A.B. from Princeton, a J.D. from Harvard Law School, and a Ph.D. in economics from UCLA.  Formerly, I practiced in corporate law, credit, and securities with Cravath, Swaine & Moore LLP in New York and Hong Kong.  My c.v. is attached to this report as Exhibit A, which contains lists of my publications and prior testimony.

### B.     Summary of opinions

In summary, I am of the following opinions:

1. The typical LLC has significant limitations on the ability to pay distributions to members.  These limitations arise under generally accepted principles of corporate governance, statutory law, typical fiduciary duties, and typical provisions in LLC agreements and other contracts.  Such capital lock-in

*Confidential*

protections are common among business entities, and are commonly thought to serve the interests of efficient financing.

2. Such generally accepted principles of corporate governance are in alignment with Texas law, which prohibits LLC distributions when the LLC is insolvent and distributions that would render the LLC insolvent.

3. The Little River Holdings LLC Agreement[1] limited distributions to cash in excess of Little River's current and future cash needs; this required management, in making distributions, to actually consider Little River's current and future cash needs.  It also provided for a tax distribution for each fiscal year, which counted as an "advance," or loan, against excess cash distributions.

4. As a default matter, the managers of an LLC are subject to fiduciary duties, which the Little River Holdings LLC Agreement explicitly affirmed.  With regard to discretionary activities that benefit themselves, management is subject to customary safeguards for the benefit of the entity; this includes full disclosure and good faith approval by a disinterested authority for self-interested transactions.  Management is obliged to obey the law and follow governance documents.  Management must be reasonably diligent and prudent in managing the LLC's business, and may not abdicate its obligation to exercise business judgment.

5. Modern organizational governance has developed commonly utilized best practices to deal with conflicts of interest and self-interested transactions.

---

[1] See Amended and Restated Company Agreement of Little River Healthcare Holdings, LLC, dated March 31, 2015 (also, the "LLC Agreement").

*Confidential*

These procedures require a fair process of full disclosure, and good faith approval by non-conflicted, non-coerced persons.

6. For a firm that is insolvent (or contemplating a transaction that would render it insolvent), the application of management's responsibilities to the firm changes. The insolvent firm's equity holders are no longer the residual claimants of the firm, and actions that benefit the equity holders may no longer be in the firm's best interests; instead, creditors are the residual claimants of the firm. When a firm is insolvent or would become insolvent by virtue of the transaction at issue, actions that benefit the equity holders can therefore violate management's responsibilities to the firm by reducing firm value.

7. Defendant managers declared multiple tax distributions, and in significant amounts. These tax distributions were paid to Little River's members, including Defendants. Defendants obtained significant benefits from the distributions. These distributions were significantly in excess of taxes actually incurred by Defendants.

8. These tax distributions were in conflict with law and with management's fiduciary duties.

   a. Tax distributions were undertaken more often than allowed under the LLC agreement. The LLC Agreement called for a tax distribution for each fiscal year; however, distributions occurred on a quarterly, or more frequent, basis.

   b. There is little evidence that management analyzed Little River's current and future cash needs in making distributions.

   c. There was significant variance and uncertainty in the profit forecasts that management utilized to arrive at their tax distribution amounts.

*Confidential*

    d.  As implemented by management, the tax distributions benefited
recipients at the expense of the company.  The combination of
imprecision, ongoing and multiple distributions, and changing profit
estimates, combined with the failure to refund overpayments, ensured
that recipients would receive distributions in excess of tax liabilities.

    e.  Little River was likely insolvent at the time of some or all of such
distributions, or was made insolvent by the distributions.

    f.  Little River management did not seek approval of the distributions from
the members as a whole or from its creditors.

### C.    Materials received from counsel

I have received from counsel the materials listed in the attached Exhibit B.  I
understand that discovery is still ongoing in this case; accordingly, I reserve the right
to supplement the opinions expressed in this report as additional discovery
information becomes available.

### II.    Constraints on LLC manager behavior with regard to distributions

There are significant constraints on managers with regard to distributions of
cash or assets out of an LLC.  These obligations arise out of a combination of features
applicable to LLCs and other similar business organizations, including recognized
principles of good governance, creditor protections, fiduciary duties, and typical
provisions of LLC organizational documents.

### A.    Protection of creditors in modern business organizations

An important aspect of modern business entities, including the LLC, is the
concept of entity separateness.  The business entity, and not its equity holders, owns
its assets and is responsible for its liabilities.  Owners do not have direct claims on the
firm's assets; rather, owners have the right to lawful distributions declared by the

*Confidential*

entity, and, in liquidation, the owners are entitled to the assets of the entity that
remain after creditors have been paid off.  Thus, an LLC's owners would not be
entitled to help themselves to the LLC's assets to the detriment of its creditors; rather,
the LLC's assets are effectively locked in, and only in specified circumstances can they
be distributed.

A large academic literature in law and economics has recognized the economic
benefits provided by such entity separateness and the resulting "asset partitioning"
that it entails.[2]  The economic purpose of legal separateness is to enable financing of,
and investment in, productive enterprise, which it does by reducing uncertainty.[3]
Creditors who lend to, or transact business with, the entity know that the entity's
assets are effectively locked in, such that they will be available to satisfy the entity's
debts; both the owners and the owners' creditors are subordinated to entity creditors.
Equity owners, as a general matter, are not entitled to the assets of the firm, and face
restrictions on their ability to receive distributions of firm assets.[4]

---

[2] *See* Henry Hansmann & Reinier Kraakman, The Essential Role of Organizational Law, 110
Yale Law Journal 387, 393 - 405 (2000) (available at
https://www.yalelawjournal.org/pdf/386_hxm176pg.pdf).

[3] *See* Henry Hansmann & Reinier Kraakman, The Essential Role of Organizational Law, 110
Yale Law Journal 387, 398 – 405, 423 - 427 (2000); Frank H. Easterbrook & Daniel R. Fischel,
Limited Liability and the Corporation, 52 University of Chicago Law Review 89 (1985); Stephen
M. Bainbridge & M. Todd Henderson, Limited Liability:  A Legal and Economic Analysis,
(Edward Elgar - 2016).

[4] See, e.g., Richard A. Booth, Capital Requirements in United States Corporation Law 15, 25 -
31 (2005) (unpublished manuscript) (on file with Villanova University Charles Widger School of
Law).

*Confidential*

These rules promote certainty and make investment and financing easier.

Creditors receive some degree of protection, even without having to draft detailed

contracts and covenants to make sure that assets stay within the firm; this may be

especially important for trade creditors, who have limited ability to bargain for such

protections. Creditors need not conduct an extensive search of the potential debts

and liabilities of the entity's owners and affiliates; rather, creditors need only consider

the assets and operations of the entity itself, which significantly reduces the

informational demands of making an informed lending decision.

### B. Limitations on distributions in LLCs

LLCs are subject to such rules for the protection of creditors, and there are

distinct limitations on the ability to distribute cash or other assets to the firm's equity

owners (or members). In Texas, one such protection is in TBOC §101.206(a), which

provides that "a limited liability company may not make a distribution to a member of

the company if, immediately after making the distribution, the company's total

liabilities… exceed the fair value of the company's total assets." In other words, an

LLC cannot make a distribution while insolvent or if that distribution would render it

insolvent.[5]

In line with this basic requirement of statutory law, LLC agreements often

provide for related restrictions, which may go further than the statute. Section 5.06 of

Little River's LLC Agreement provides that:

> From time to time (but at least once each calendar quarter) the Managers
>
> shall determine in their reasonable judgment to what extent (if any) the
>
> Company's cash on hand exceeds its current and anticipated needs,

---

[5] See Miller & Ragazzo, Texas Practice Series, Business Organizations §20:10.

*Confidential*

>including, without limitation, for operating expenses, debt service,
acquisitions, and a reasonable contingency reserve (any such excess
amounts, the "Excess Cash"). If there exists Excess Cash, the Managers
shall cause the Company to make distributions to each Class A Member
and Class B Member holding Participating Class B Interests an amount
equal to his, her or its Share Ratio of any such distribution amount....[6]

The coverage of this provision is somewhat different than that of the TBOC requirement, in that it takes into account the company's current and anticipated needs for cash. Putting the LLC Agreement provision together with the TBOC requirement, the managers of Little River were authorized and permitted to make excess cash distributions if, and only if, (i) Little River was balance sheet solvent and would remain balance sheet solvent after the distribution, and (ii) Little River had cash on hand in excess of its current and anticipated needs.

In addition to this provision for distributions of excess cash, the Little River LLC Agreement provided for tax distributions to its members.  Tax distributions are a common aspect of LLCs that allow or require the company to distribute cash to members to reimburse them for the taxes to which they will be subject due to the pass-through nature of LLC taxation.[7]  In this case, §5.05 of the LLC Agreement provided that:

---

[6] Amended and Restated Company Agreement of Little River Healthcare Holdings, LLC dated March 31, 2015.

[7] Given the popularity of the LLC form, practitioner publications commonly address the tax distribution issue.  See, e.g., 11 Things to Consider When Negotiating a Tax Distribution Provision, June 20, 2018 (available at https://www.comitersinger.com/blog/11-things-to-consider-when-negotiating-a-tax-distribution-provision/).

*Confidential*

Subject to the provisions of the last sentence of Section 5.07, and subject to financing and contractual arrangements to which the Company is subject, the Managers shall use reasonable best efforts to cause the Company to make a distribution of cash to each Member with respect to each fiscal year of the Company in an amount that, in the good faith judgment of the Managers, equals the excess, if any of (A) (i) the amount of taxable income allocable to such Member in respect of such fiscal year, net of taxable losses allocated to such Member in prior fiscal years not previously taken into account under this Section 5.05, multiplied by (ii) the combined maximum federal, state and local income tax rate to be applied with respect to such taxable income (calculated by using the highest maximum combined marginal federal, state and local income tax rates to which any Member (or any of its owners, in the case of a Member that is a flow-through entity) may be subject and taking into account the character of such taxable income and the deductibility of state income tax for federal income tax purposes), over (B) the amount distributed to such Member under Section 5.06 with respect to such fiscal year. Distributions for taxes under this Section 5.05 with respect to each fiscal year shall be made no later than 120 days following the close of such year, and shall be treated as an advance of, and shall therefore reduce, amounts otherwise distributable to the applicable Member pursuant to Section 5.06.

Under this provision, the Managers were obligated to utilize their good faith judgment to determine the Company's fiscal year income, and to distribute a percentage of that (namely, the fraction equal to the maximum tax rate) to the

*Confidential*

Members.  Section 5.05 specifies one distribution for each fiscal year, to be made no

later than 120 days after the fiscal year end.[8]  Further, such distributions were an

"advance" on amounts to be distributed under §5.06.  An advance is a loan, and in

this case would be made in anticipation of excess cash distributions to be paid under

§5.06.

Taking into account both the TBOC and §5.06, tax distributions were not

proper if the company was insolvent (or would be rendered insolvent) or if the cash

and liability situation was such that Little River would likely be unable to meet current

and future cash needs.  Further, tax distributions were improper if not undertaken in

accordance with the company's outstanding financing and contracts.

### C.    Fiduciary duties

LLCs evolved as, essentially, a combination of corporate and partnership forms,

and are designed to enable a wide variety of governance procedures.  Owing to this

developmental history, as a default matter those who manage LLCs have the same

traditional fiduciary duties that inhere in other business organizational forms.[9]

---

[8] Little River's outstanding credit agreement also limited tax distributions to one annual

distribution.  See Credit Agreement dated March 31, 2015 at §11.4.

[9] *See*, *e.g.*, Delaware Limited Liability Act § 18-1101(c) ("To the extent that, at law or in equity,

a member or manager or other person has duties (including fiduciary duties) to a limited

liability company or to another member or manager or to another person that is a party to or is

otherwise bound by a limited liability company agreement, the member's or manager's or other

person's duties may be expanded or restricted or eliminated by provisions in the limited

liability company agreement; provided, that the limited liability company agreement may not

eliminate the implied contractual covenant of good faith and fair dealing."); Delaware Limited

Liability Act § 18-1104 ("In any case not provided for in this chapter, the rules of law and

*Confidential*

As commentators have observed, the basic building block of the modern business association is the principal-agent relationship, which has ancient origins and provides a common genesis for modern organizations.[10] Fiduciary duties arise largely, though not exclusively, out of common law doctrines of agency and other similar relationships. The agent has the authority to deal with the principal's property, and to bind the principal in contract and tort, so long as the agent is acting within the scope of the agent's duties. As agents often exercise significant discretion and judgment over the principal's assets and business (analogous to the separation of ownership and control present in many organizational forms), courts in the common law tradition have long imposed substantive duties on the agent that require the agent to act in the

---

equity, including the rules of law and equity relating to fiduciary duties and the law merchant, shall govern.").

[10] *See*, *e.g.*, Allen, Kraakman & Subramanian, Commentaries and Cases on the Law of Business Organization, 3rd Edition, at 1 ("The agency relationship can be thought of as the simplest form of business organization.... In agency law... we see prefigured many of the most basic and difficult problems of corporation law, most particularly those arising from the so-called fiduciary duty of loyalty."). Oliver Wendell Holmes ascribed the origins of modern agency to Roman law. *See* Oliver Wendell Holmes, Collected Legal Papers (New York: Peter Smith 1952; originally published 1920) at 51, 56-58. In particular, a Roman patriarch enjoyed agency-like relationships with both his family members (in the *pater familias*) and his slaves (in the *peculium*), which some commentators believe to prefigure modern organizational forms. *See* Henry Hansmann, Reinier Kraakman, and Richard Squire, Law and the Rise of the Firm, 119 Harvard Law Review 1335 (2005) at 1357 – 1360.

*Confidential*

principal's best interests and restrict the agent from benefitting himself.[11]  These
duties, in their most general terms, require that the agent deal with the principal's
affairs with reasonable diligence and care (the duty of care) and that the agent act in
the best interests of the principal (the duty of loyalty).  Commentators and some
jurisdictions (including in Texas) also explicitly break out an additional duty of
obedience, which requires an agent to obey lawful commands and obey the law.[12]

As these duties have been refined over time, the agent must act in compliance
with the express and implied terms of any contract with the principal;[13] must act with

---

[11] The emergence of fiduciary duties as a separate principle in the common law has been traced
back to medieval English courts, which imposed duties of care and loyalty on early quasi-
trustees and others (such as bailees) having discretion over property belonging to the principal
or beneficiary.  *See* David J. Seipp, Trust and Fiduciary Duty in the Early Common Law, 91
Boston University Law Review 1011 (2011) at 1034 – 1036.

[12] See Elizabeth Miller, Fiduciary Duties, Exculpation, and Indemnification in Texas Business
Organizations (2020) at 1,6, 12 (available at
https://www.baylor.edu/law/facultystaff/doc.php/117971.pdf); David Rosenberg, Delaware's
"Expanding Duty of Loyalty" and Illegal Conduct: A Step Towards Corporate Social
Responsibility, 52 SANTA CLARA L. REV. 81, 86–87 (2012) (noting that approval of profit-
motivated illegal activity is a breach of a director's fiduciary duty); Elizabeth S. Miller & Robert
A. Ragazzo, 20A Texas Practice Series, Business Organizations (3d ed. November 2020) § 36:11
("[D]irectors have a duty to observe the law" and "they stand to be liable for taking illegal
action.").  While the substance of the duty of obedience, and the obligation to follow the law, is
common to business entity law, it is sometimes considered a subset of another duty.  See Alan
R. Palmiter, Duty of Obedience:  The Forgotten Duty, 55 NYLS Law Review 457 (2011).

[13] See Restatement (Third) of Agency §8.07.

*Confidential*

care, competence, and skill;[14] must act loyally for the principal's benefit;[15] must not
use the principal's property for the agent's own purposes;[16] must comply with the
principal's lawful instructions;[17] and must refrain from conduct, including illegal
conduct, that is likely to damage the principal's enterprise.[18]

The same form of fiduciary duties continues to exist in more complex forms of
organizations, such as the corporation and, more recently, the LLC.  Managers of such
entities are fiduciaries of those entities, and are bound to put the entities' interests
ahead of their own.

While traditional fiduciary duties are the default for LLCs, they are subject to
negotiation and contractual modification.  The modern LLC is intended to maximize
the ability of a business to be organized by contract, allowing the business
participants to specify the means and rules by which the business will run.[19]
Accordingly, modern LLC statutes typically provide for a great degree of choice (though
not unlimited) regarding governance, including who will manage the LLC, and to what

---

[14] See Restatement (Third) of Agency §8.08.

[15] See Restatement (Third) of Agency §8.01.

[16] See Restatement (Third) of Agency §8.05.

[17] See Restatement (Third) of Agency §8.09.

[18] See Restatement (Third) of Agency §8.10.

[19] *See*, *e.g.*, Delaware Limited Liability Company Act §18-1101(b) ("It is the policy of this
chapter to give the maximum effect to the principle of freedom of contract and to the
enforceability of limited liability company agreements.").

*Confidential*

rules of conduct the managers and control persons will be subject.[20] From an
economic perspective, as the ability to contract for desired governance is greater, the
need for fiduciary duties may be less.  The reasoning is that default or mandatory
rules are less useful (and may be burdensome) if the parties may readily protect
themselves by contract and/or direct participation in management.  Thus, while there
exists variation among the states,[21] some degree of modification of fiduciary duties is
typically permitted, of greater or lesser extent.

In this case, the Little River LLC Agreement explicitly affirms the traditional
fiduciary duties of Texas corporate law.  Section 6.01(b) of the Little River LLC
Agreement provides:

> The Managers, in the performance of their duties as such, shall owe to
> the Members fiduciary duties, including duties of loyalty and due care, of
> the type and to the extent owed by directors of a corporation to such
> corporation and its stockholders under the laws of the State of Texas
> (including the Code).

---

[20] *See* Larry E. Ribstein, Statutory Forms for Closely Held Firms:  Theories and Evidence from
LLCs, 73 Washington University Law Quarterly 369 (1995) (surveying relatively early
development of LLC statutes across states).

[21] While the Uniform Limited Liability Company Act ("ULLCA") only permitted limited
modification of fiduciary duties, the Revised Uniform Limited Liability Company Act ("RULLCA")
permits elimination of fiduciary duties.  RULLCA has been adopted in only a minority of states,
leaving either ULLCA or state-specific statutes in place in the others.  See Johnson & Tanner,
Modification of Fiduciary Duties in Limited Liability Companies, In-House Defense Quarterly
(Summer 2018) (available at (https://www.jacksonkelly.com/uploads/DRI-Article-2018-03-
Johnson-Tanner.pdf).

*Confidential*

Section 6.10(c) contains an analogous provision for the company's officers.

With regard to distributions, fiduciary duties raise several issues. First, to the extent that managers themselves are receiving or benefitting from a discretionary distribution, the manager's duty of loyalty is implicated due to the managers' conflict of interest. While managers may pay themselves duly authorized salaries (or other payments defined by a duly authorized contract) without implicating the duty of loyalty, discretion of managers to pay themselves, and to determine the amount, raises conflict issues that do implicate the duty of loyalty.

For a self-interested transaction such as a discretionary distribution to the managers, best practices are to follow the cleansing procedures that have evolved for such transactions. Discussed in more detail below, this typically requires full disclosure of the self-interested transaction to a disinterested group that has been granted the requisite authority to approve such transactions.

Second, the duty of care requires that the managers and officers of the LLC undertake the distribution with reasonable prudence. While the business judgment rule is typically thought to protect against simple negligence in many contexts, grossly negligent or wasteful conduct is not protected (self-interested conduct is also unprotected, as this constitutes a duty of loyalty violation). As a practical matter, this means that managers and officers need to engage in a reasonable deliberative process, not abdicate their obligation to make informed decisions, and arrive at a decision that has some basis in reason.

Third, the duty of obedience requires managers and officers to obey the law and the firm's organizational documents. The firm and its members have important interests in having their agreements or other formative documents enforced, just as the state's public policy concerns militate toward imposing liability for serious

16

*Confidential*

violations of law.  While disobedience that results in a net gain to the firm may create

conceptual problems with regard to issues such as standing and damages, where

violations lead to significant harm to the firm, there is little question that disobedient

managers find themselves liable.

### D.  Best practices for conflict transactions

Conflicts of interest arise in the corporate governance context where managers

or control persons of a firm stand to benefit from an activity or transaction that may

not be in the best interests of the firm itself.   The benefit to the manager may be

direct (such as where the manager causes the entity to transact with himself) or

indirect (where the transaction is with an affiliate, such as an employer, of the

manager).

Where managers of a business entity engage in activity in which they have no

conflict of interest, their decisions are typically subject to significant deference under

the business judgment rule.  However, in transactions in which managers, they are

subject to the entire fairness standard, under which the transaction must be fair to

the entity both in terms of process and result.[22]   A fair process necessitates that the

---

[22] *See* Miller & Ragazzo, Texas Practice Series:  Business Organizations §36:7; *Popperman v.*

*Rest Haven Cemetery, Inc.*, 162 Tex. 255, 259 (1961) (noting that the Texas Supreme Court had

considered "the problem of contracts between officers and directors and the corporation itself,

and recognized that such contracts are binding where the contracting director establishes the

fairness of the transaction to the corporation"); *Felty v. Nat'l Oil Co. of Texas*, 155 S.W.2d 656,

658 (Tex. Civ. App. 1941) ("The applicable rule of law is so well stated by the Supreme Court of

the United States in Geddes v. Anaconda Copper Mining Company, 254 U.S. 590, 41 S.Ct. 209,

212, 65 L.Ed. 425, that we quote from the opinion: "The relation of directors to corporations is

of such a fiduciary nature that transactions between boards having common members are

*Confidential*

conflicted transaction approaches or simulates arm's-length bargaining; those who

make decisions on the firm's behalf must be fully informed and free from coercion or

conflict.  A fair price requires that the substantive merits of the conflicted transaction

are actually a fair deal for the firm; the price paid for the good received must be within

the range of what reasonable, informed, and rational market participants would agree

to.

It is generally thought that a conflicted transaction may withstand such

fairness review if the transaction is negotiated by persons at the firm who are both

fully informed and untainted by any conflict themselves in the transaction, which

includes being free from any threats or coercion based on their decision-making (such

---

regarded as jealously by the law as are personal dealings between a director and his

corporation, and where the fairness of such transactions is challenged the burden is upon

those who would maintain them to show their entire fairness and where a sale is involved the

full adequacy of the consideration."); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 – 11 (Del.

1983) ("The requirement of fairness is unflinching in its demand that where one stands on both

sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass

the test of careful scrutiny by the courts.... The concept of fairness has two basic aspects: fair

dealing and fair price. The former embraces questions of when the transaction was timed, how

it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the

directors and the stockholders were obtained. The latter aspect of fairness relates to the

economic and financial considerations of the proposed merger, including all relevant factors:

assets, market value, earnings, future prospects, and any other elements that affect the

intrinsic or inherent value of a company's stock. ... However, the test for fairness is not a

bifurcated one as between fair dealing and price. All aspects of the issue must be examined as

a whole since the question is one of entire fairness.").

*Confidential*

as firing or removal from office, which would disqualify employees of the fiduciary or control person).  Additionally, the price paid by the firm must meet a market standard and approximate what arm's-length bargaining would produce.  Where the transactions are subject to an existing contract that has been fairly negotiated, any value given up by the firm would have to be called-for or appropriate under the terms of that contract.

The entire fairness standard is exacting and difficult to meet.  In light of this, over time, procedures have been developed by which the taint of conflicted transactions may be cleansed.  These procedures typically involve full and fair disclosure of the details of the conflict and the transaction at issue, and then fair and uncoerced ratification by a duly authorized decisionmaker to approve the transaction.  For example, where the conflict involves conflict on the part of a firm's manager, full disclosure to, and ratification by, the firm's equity owners may cleanse the transaction.  Alternatively, where only a subset of the firm's managers is conflicted, disclosure to and approval by the non-conflicted managers may cleanse the transaction.  Such procedures are enshrined, for instance, in the Texas Business Organizations Code, Delaware General Corporation Law, and the Delaware Limited Liability Company Act, each of which provides cleansing procedures of disclosure and approval.[23]  However, even such procedures may fail to cleanse a transaction where conflict is sufficiently pervasive that fairness and good faith are doubtful.[24]

---

[23] *See* Texas Business Organizations Code §21.418, §101.255; Delaware General Corporation Law § 144; Delaware Limited Liability Company Act § 18-607.

[24] *See* Miller & Ragazzo §36:7, §20:40; Amir Licht, Farewell to Fairness:  Towards Retiring Delaware's Entire Fairness Review, European Corporate Governance Working Paper No. 439/2019 at 6 – 7, 25 – 32 (available at https://ssrn.com/abstract=3331097).

One such problematic situation is where the firm is, or may become, insolvent. As described below, in the case of an insolvent firm, all of the equity holders may be inherently conflicted since they stand to benefit from expropriating the firm's value, to the detriment of the firm and its creditors.

The Little River LLC Agreement addresses conflicted transactions, and while it allows that they may occur, it requires substantive fairness. Particularly, the Little River LLC Agreement states that "[t]he Company may transact business with any Manager, Member, Officer or Affiliate thereof; provided, that such transactions are entered into on arms'-length terms."[25]

### E.    The economic effect of insolvency

Insolvency affects the implementation of fiduciary duties. Because the firm is the direct beneficiary of managers' fiduciary duties, managers fulfill their fiduciary duties by maximizing the expected value of the firm. From an economic perspective, such a result can be achieved by maximizing the expected returns to the firm's residual claimants: they are the ones who ultimately bear any increases or decreases in firm value. Thus, a sort of economic shorthand has developed for fiduciary duties, in which managers can treat the residual claimant as the beneficiary of the fiduciary duties. Such a shorthand is useful where it is easier to gauge whether an action is beneficial to equity than to gauge the overall effect on the firm's enterprise value, which usually includes significant other stakeholders.

For a highly solvent firm, then, a manager can safely treat equity holders as the beneficiaries of the manager's fiduciary duties, and can direct his or her work toward benefiting the equity holders. While being a residual claimant is not strictly an on-or-

---

[25] Little River Holdings LLC Agreement § 6.09.

*Confidential*

off affair, since even a highly solvent firm may be rendered insolvent by extraordinary

circumstances or exceptional risk-taking, for the most part such a rule provides a

useful heuristic for the manager and for courts.  Actions that benefit the equity

holders benefit the highly solvent firm since it is likely that the equity holders will

enjoy the increased profits (or bear the increased losses).  For actions that simply

transfer value from the firm to equity holders, such as dividends or other

distributions, the equity holders as a whole should be indifferent:  what they gain in

transfers, they lose in firm value.  For transfers that are destructive of value, such as

inefficiently liquidating valuable firm assets in order to fund a distribution to equity

holders, the equity holders would object:  as residual claimants, they will lose more

from the inefficient liquidation and diminution of firm value than they will gain from

the transfer of liquidated proceeds.  Generalizing from these examples, in a highly

solvent firm, whatever benefits the equity holders is consistent with maximizing firm

value (and fiduciary duty), and whatever hurts them is inconsistent.

When the firm approaches, or is in, insolvency, such a simple calculus no

longer applies.  For an insolvent firm, the residual claimants comprise the firm's

creditors; as the firm is more deeply insolvent, the equity holders are increasingly

unlikely to enjoy any residual returns of the firm.  In such a case, actions that benefit

the equity holders may harm the firm and diminish its value, contrary to the

manager's fiduciary duties.  Equity holders may actually prefer that the manager

undertake actions that harm the firm if they result in the transfer of value of the

equity holders.  Such actions could include payments to equity holders that are not

justified or which do not provide commensurate value to the firm, even if such

transfers destroy firm value and harm its future viability.  Thus, as a firm moves from

solvency to insolvency, the ultimate beneficiary changes:  fiduciary duties effectively

*Confidential*

track the residual claimholder status, which move from the equity holder to the creditor.

Insolvency affects the locus of conflicts of interest as well as the requisite means for cleansing them, placing the interests of the equity holders in conflict with those of the firm.  Actions that benefit even all of the equity holders ratably are potentially conflicted, since ratable sharing among (and approval by) the equity holders no longer implies that the action is actually to the firm's benefit.  Ratification by the equity holders is, by logical extension, not effective in cleansing such transactions.  Similarly, if the firm's managers are beholden to the equity holders, their approval of the action cannot serve to cleanse it of conflict, either.  Cleansing in such a case would require something along the lines of the appointment of independent, fully informed managers in advance of the contemplated transaction, who could populate a special committee to deliberate and decide the issue.  Alternatively, the firm's creditors could approve the transactions, though in many cases this may not be feasible.

### III.    Activities of Little River managers with regard to distributions

I have reviewed the discovery record in this case with regard to distributions that were declared by Little River and distributed to the Defendants and other members.

#### A.    Multiple distributions

The Little River managers and members did not follow the Little River LLC Agreement with regard to the number and frequency of distributions.  The LLC Agreement called for one distribution per fiscal year; however, the Little River

*Confidential*

managers and members made many such distributions.[26]  Further, making multiple

distributions was in conflict with Little River's outstanding credit facility;[27] compliance

with outstanding contracts was a pre-requisite of tax distributions under the LLC

agreement.  Overall, the practice of making more frequent distributions – and making

them earlier in the year – would tend to make profit estimates less accurate; absent

clawbacks of distributions, this practice would, in expectation, benefit the recipient

members and harm the company.

### B.    Failure to consider current and future liabilities

I did not see any evidence that management of Little River prioritized Little

River's current and future cash requirements in making distributions, as they were

obligated to do under the Little River LLC Agreement.  Instead, Little River's

management appeared eager to make tax distributions based on early and speculative

projections.  For instance, Downton expressed the desire to have tax distributions

made within a month of quarter's end.[28]  Similarly, in response to Madison's

suggestion to use cash to pay off Little River's line of credit, Downton objected on the

---

[26] Defendants' Responses to Plaintiff's Mixed Discovery Requests, dated March 25, 2022; see

also P 0042223 [INT0000096205] (email acknowledging that tax distributions were limited to

once a year under the credit agreement and that creditor permission would be needed for more

frequent tax distributions).

[27] See Credit Agreement §11.4

[28] See P 0043728 (email chain dated January 6, 2016, among DeReese, Downton, Borgfeld,

and Madison).

*Confidential*

basis of prioritizing third and fourth quarter tax distributions totaling $10 million and $6.5 million to Boston Heart.[29]

For example, an email chain dated February 24, 2016 illustrates the imprecision, optimism, and guesswork that accompanied the officers' and managers' distribution decisions:  a tax distribution of $5 million was authorized on the basis of lower-than-expected payroll, "preliminary Cash Report numbers," that day's cash collections, and an "assume[d]" increase in net income of "something between $8.8 [million] and $15.5 [million]."[30] Despite the recommendation of George DeReese, Little River's assistant CFO,[31] to distribute $4 million and noting a preference to "under distribute than over distribute," Jeff Madison ordered a distribution that week of $5 million and stated that, "[o]nce we have better numbers of the next 30-45 days, we will probably distribute another 1.5-2.0 million."[32]  This discussion focused on how much cash was on hand and projected profits; there was no significant discussion of Little River's cash needs, present or future.

Despite this lack of deliberation, it appears that there was significant reason to believe Little River would experience problems with regard to its cash flows.  Little River engaged in a plan of aggressive growth; such a plan would almost certainly require significant amounts of cash.[33]  Additionally, the Little River business model

---

[29] See P 0060839 [INT0000073310] (email chain among Madison, Downton, Borgfeld dated January 6, 2016).

[30] See P 0061268 [INTO0000145691].

[31] See DeReese Deposition at 8.

[32] Ibid.

[33] See Final Arbitration Award, dated May 6, 2020, at ¶¶ 15-18; Expert Report of Saul Solomon dated April 4, 2022 at 3, 7 – 8.

*Confidential*

relied on reimbursement by insurers, which could take significant amounts of time to

occur and which were subject to risks including non-payment, delay, contract

adjustments, and attempts to recoup amounts already paid.[34]

### C.    Imprecision in earnings estimates

The distributions were made on an ongoing, rolling basis, such that monies

were distributed well before the books were closed on the fiscal year in question.  This

necessarily introduced a great deal of imprecision, as opposed to waiting until the

fiscal year was resolved and the company's books and records were reasonably

complete.

These earnings estimates varied substantially from estimate to estimate.  This

indicated that the forecasts were imprecise at best and, given the ratcheting nature of

distributions (in that the members never refunded overpayments), this imprecision

worked to the expected benefit of the members and managers.

Communications at the time suggest that the managers were aware of

overpayments.  For example, a spreadsheet April 5, 2017 circulated to Borgfeld,

Downton, and Madison showed an excess distribution of $4,234,130 based on an

updated forecast of fiscal 2016 profits.[35]  The magnitude of this over-distribution was

---

[34] See Expert Report of Saul Solomon dated April 4, 2022 at 8 – 12; see Expert Report of Mark

Herbers dated April 15, 2019 at 5 – 10; see e.g., Deposition of Ryan Downton, dated April 7,

2022, at p. 92 - 93, 95 - 96 (testifying that Little River was aware Blue Cross was going to want

to negotiate lower payment terms and that it was common for insurers to seek to transition

from percent of charge to flat fee contracts in 2016); Deposition of Kevin Owens, dated Feb. 11,

2022, at p. 66 (testifying that all insurance companies were trying to move to a fee based

scheduled at the time).

[35] See P 0060474 [INT0000064538], P 0060476 [INT0000064538.0001].

*Confidential*

significant:  actual distributions exceeded projected allowed tax distribution by 39%.
Similarly, in a June 10, 2016 email from Ryan Downton, Downton noted that, "we will
have some over-distribution from 2015 – and that is fine – we've already agreed that
we aren't truing that up."[36]

Further, it is my understanding that two of the Defendants have been named in
a federal complaint for allegedly orchestrating a kickback scheme at Little River.[37]  In
addition to being a serious violation of law, if proven, such an alleged scheme would
serve to inflate firm revenues and profits beyond what they would otherwise be, with a
consequent short-term effect on profit forecasts and tax distributions.  Emails from as
early as March 2016 discuss risks of paying percentage-based incentive compensation
to independent contractors for referrals of business.[38]

**D.    The tax distributions were heads-I-win-tails-you-lose**

The record of distributions indicates that the multiple tax distributions at Little
River worked as a ratchet, under which the total amount distributed could only go up,
with frequent interim distributions, and never go down.  If the managers' profit
estimates increased, the managers would declare an additional distribution.  However,

---

[36] P 0060934 [INT0000109832] (email chain dated June 10, 2016, among Downton, Borgfeld,
Madison, and Ballard).

[37] See Complaint, United States of America v. Grottenhaler et al, Civil Action No. 4:16-CV-547,
U.S. District Court, Eastern District of Texas, filed January 31, 2022.

[38] See P 0116994 (email dated March 21, 2016 from Adam Aseron to Ryan Dowtnon, noting
that only 1 of 4 vetted marketing partners had checked out with a "clean bill of health."); P
0117270 (Email dated April 12, 2016, in which Downton rejects Aseron's recommendation to
terminate for cause Little River's contract with Next Level); P 0116996; P 0116986; P 0117124;
P 0117263.

*Confidential*

despite the fact that tax distributions were in excess of actual tax liability and were

based on overestimated profits, members never returned the excess distributions to

Little River.[39]  Such a system would be expected to work to the benefit of the managers

and members receiving distributions, and to the detriment of the company.

It does not appear that tax distributions under the LLC Agreement were

intended to work this way.  The Little River LLC Agreement specifically stated that tax

distributions were an "advance" against excess cash distributions.  An advance is a

loan, and implies that such distributions would ultimately need to be earned as excess

cash accrued and distributions were declared, or else repaid.  The LLC Agreement

allowed for one tax distribution per fiscal year, not multiple.  Further, the managers

were expected to use their "good faith judgment" and abide by other fiduciary duties in

carrying out these distributions.[40]

### E.    Little River was insolvent at the time of the distributions

According to the expert report of Saul Solomon dated April 4, 2022, Little River

was experiencing a significant strain on cash flows and liquidity as early as 2015;[41]

Little River was potentially insolvent as of the time of (or as a result of) the

distributions made in 2016.[42]  Distributions made without having adequate cash to

pay current and future liabilities are contrary to the Little River LLC Agreement, and

---

[39] P 0061003 [INT0000126690] (email to Downton dated May 25, 2017 asking "owners to

recontribute those excess distributions"); P 0060995 [INT0000126670] (discussing same with

Madison); Deposition of Ryan Downton, dated April 7, 2022, at p. 214-217 (testifying that

owners declined to pledge excess distributions).

[40] See Little River LLC Agreement §§5.05, 6.01.

[41] See Expert Report of Saul Solomon dated April 4, 2022 at 2 – 3, 13 – 14.

[42] See id. at 3, 2 – 3, 13 – 14, 22 - 23, 37 – 38.

*Confidential*

would, at best, have been advances, or loans, against future excess cash distributions.

Further, distributions while (or causing the company to become) insolvent are contrary

to the Texas Business Organizations Code, which prohibits distributions while, or that

would render the company, insolvent.

### F.    Little River's managers never sought to or obtained consent

Despite the self-interested nature of the tax distributions and the managers'

discretion in choosing to make them, I have seen no indication in my review of

discovery materials in this case that the managers and officers ever undertook to

disclose to, and obtain the consent of, either Little River's complete set of members or

Little River's creditors.[43]  Nor did I see any evidence that any such consent was

granted or granted in good faith.  The problem of pervasive conflict (in that all

managers and members were conflicted) could have been remedied by appointing and

constituting a committee of disinterested managers, essentially outsourcing the

decision-making to a fully informed and disinterested party.  This is a common

practice in cases involving pervasive conflicts of interest.

### IV.    Conclusion

Business entities, including Texas LLCs, are subject to laws and governance

practices designed to protect creditors and to facilitate efficient financing.  These

operate, inter alia, by restricting the ability of equity owners to remove capital from the

entity.  Texas LLCs are subject to limitations on distributions, which disallow

distributions made while the LLC is insolvent or that would render the LLC insolvent.

In addition, it is common that LLC agreements will contain additional limitations.  The

---

[43] In addition to the distributions, I have seen documentation of two additional self-interested transactions.  See INT0000003219.0002, INT0000004442.

*Confidential*

Little River LLC Agreement permitted distributions of cash in excess of that required for Little River's current and future needs. It also allowed a distribution for each fiscal year to recompense members for taxes incurred due to the tax-partnership nature of the LLC; such tax distributions were an advance against excess cash distributions.

LLCs are, as a default matter, subject to traditional fiduciary duties, and the Little River LLC Agreement explicitly affirmed such duties. These duties required managers and members to deal fairly with the company, not act adversely, exercise due care and consideration, and refrain from unauthorized self-dealing. Best practices have evolved for authorizing self-dealing transactions, which consist of full and fair disclosure to, and approval in good faith by, a disinterested governing authority or the members. For a firm that is insolvent, or would be rendered insolvent by the transaction at issue, the benefit of fiduciary duties shifts to the creditors, and neither the conflicted managers nor conflicted equity holders would be able to approve such a transaction in good faith.

In this case, based on my review of the record, I have concluded that

- Tax distributions were undertaken more often than allowed under the LLC agreement.

- The managers appear not to have adequately analyzed Little River's current and future cash needs in deciding upon distributions.

- There was significant imprecision and uncertainty in the profit forecasts that management utilized to arrive at their tax distribution amounts.

- As implemented by management, the tax distributions benefited recipients at the expense of the company. The imprecision of profit estimates, early timing, and frequency of distributions, combined with

*Confidential*

the failure to refund overpayments, ensured that recipients would receive distributions in excess of tax liabilities.

- Little River was likely insolvent at the time of many or all of such distributions.

- Little River management did not seek approval of the distributions from a disinterested governing authority, from the members as a whole, or from its creditors.

Signed this 14th day of April 2022.

James C. Spindler

### JAMES C. SPINDLER

University of Texas School of Law
727 E. Dean Keeton Street
Austin, TX 78705
jspindler@law.utexas.edu

## EMPLOYMENT

UNIVERSITY OF TEXAS SCHOOL OF LAW
Professor and Hart Chair in Corporate and Securities Law, September 2018 to present
Sylvan Lang Professor of Law, September 2010 to September 2018
Courses:  Federal Income Tax, Corporate Tax, Capital Markets and Financial Intermediation,
Securities Regulation, Business Associations, Commercial Transactions, Corporate Finance
Seminar, Workshop in Business Law & Economics

MCCOMBS SCHOOL OF BUSINESS, UNIVERSITY OF TEXAS AT AUSTIN
Professor, September 2011 to present

UNIVERSITY OF SOUTHERN CALIFORNIA GOULD SCHOOL OF LAW
Associate Professor of Law and Business, April 2008 to August 2010
Assistant Professor of Law and Business, August 2005 to April 2008
Appointment by courtesy, USC Marshall School of Business

UNIVERSITY OF CHICAGO LAW SCHOOL
Visiting Professor of Law, Spring 2010
Visiting Assistant Professor of Law, July 2004 to June 2005
John M. Olin Fellow in Law and Economics and Lecturer in Law, July 2003 to June 2004

UNIVERSITY OF VIRGINIA SCHOOL OF LAW
Visiting Professor, September 2004

CRAVATH, SWAINE & MOORE LLP
Associate, New York and Hong Kong, 2000 - 2003
Practice focused on securities law, syndicated debt, and international corporate finance

## EDUCATION

U.C.L.A. DEPARTMENT OF ECONOMICS, Ph.D. 2010, C.Phil. 2008, M.A. 2007
National Science Foundation Graduate Fellowship
Concentrations:  Asset Pricing, Microeconomics

HARVARD LAW SCHOOL, J.D. 2000
*Magna cum laude*
John M. Olin Prize in Law and Economics
Teaching Fellow, Department of Economics

PRINCETON UNIVERSITY, A.B. 1997
*Magna cum laude* in Politics, certificate in Political Economy

**PUBLICATIONS, PRESENTATIONS, AND GRANTS**

PUBLICATIONS

| | |
|---|---|
| 2021 | The Promise of Diversity, Inclusion & Punishment in Corporate Governance (with Jeff Meli) 99 *University of Texas Law Review* 1387 - 1422 |
| 2019 | Optimal Deterrence When Shareholders Desire Fraud, 107 *Georgetown Law Journal* 1071 – 1103 |
| 2018 | Insider Trading and the Coasian Firm, Revisited, 71 *SMU L. Rev.* 967 - 985 |
| 2017 | Vicarious Liability for Managerial Myopia, 46 *Journal of Legal Studies* 161 – 185 |
| 2017 | We Have a Consensus on Fraud on the Market – And It's Wrong, 7 *Harvard Business Law Review* 67 - 114 |
| 2017 | Taking Systemic Risk Seriously in Financial Regulation, 92 *Indiana Law Journal* 1559 |
| 2012 | Hidden Costs of Long Term Compensation, 13 *Journal of Theoretical Inquiries in Law* 623 – 642 |
| 2011 | Vicarious Liability for Bad Corporate Governance:  Are We Wrong About 10b-5?, 13 *American Law & Economics Review* 359 – 401 |
| 2011 | Integrity and Innovation in the Public Capital Markets:  A Survey of the Securities Law Literature,  *Research Handbook of Law, Innovation and Growth*, Robert Litan (ed.), (Edward Elgar Press) 45-66 |
| 2011 | Making the Next Financial Crisis Worse, One Regulation at a Time, Forbes.com |
| 2011 | Mandatory Long Term Compensation in the Banking System – and Beyond?, 34 *Regulation* 42 – 48 |
| 2009 | How Private is Private Equity, and at What Cost?, 76 *University of Chicago Law Review* 311-334 |
| 2007 | IPO Liability and Entrepreneurial Response, 155 *University of Pennsylvania Law Review* 1187-1228 |
| 2007 | Why Shareholders Want Their CEOs to Lie More after Dura Pharmaceuticals, 95 *Georgetown Law Journal* 653-691 (reprinted in *Securities Law Review 2008*, Donald C. Langevoort (ed.)) |
| 2006 | Conflict or Credibility:  Analyst Conflicts of Interest and the Market for Underwriting Business, 35 *Journal of Legal Studies* 303-325 |
| 2006 | Is it Time to Wind Up the Securities Act of 1933?, 29 *Regulation* 48-55 |
| 2005 | Corporate Heroin:  A Defense of Perks, Executive Loans, and Conspicuous Consumption (with M. Todd Henderson), 93 *Georgetown Law Journal* 1835-1883 |
| 2005 | Communication by Other Means, 28 *Regulation* 48-53 |

WORKING PAPERS

- Informative Wages and Employer Learning (with Jeffrey Meli) available at https://ssrn.com/abstract=4038925

- The Effect of Salary History Bans on Wages, Learning, and the Gender Pay Gap (with Jeffrey Meli) available at https://ssrn.com/abstract=3767958

- Salary History Bans and the Gender Wage Gap (with Jeffrey Meli) available at https://ssrn.com/abstract=3361431

- Long-term Incentives to Underperform in the Short Term, available at
  http://ssrn.com/abstract=2640172
- IPO Disclosure, Underpricing, and Litigation Risk, revise and resubmit, available at
  http://ssrn.com/abstract=1396818

GRANTS AND AWARDS

Workshop in Business Law & Economics 2018-2019

NASDAQ OMX Capital Markets Grant 2013-2014

Southern California Innovation Project, February 2009 – February 2010
   Principal Investigator, *The Securities Act and Entrepreneurs' Cost of Public Capital*

Southern California Innovation Project, February 2009 – February 2010
   Principal Investigator, *The Impact of Securities Law Reform on Entrepreneurial Effort*

McDermott, Will & Emery Research Award, June – August 2007

McDermott, Will & Emery Research Award, June – August 2006

James H. Zumberge Faculty Research and Innovation Fund, July 2006 – June 2008
   Principal Investigator, *Do Mandatory Disclosure Rules Result in Better Information for the
   Marketplace?*

SELECTED PRESENTATIONS

- University of Texas McCombs School of Business, Salem Center, *Reconsidering Insider
  Trading*, March 2022
- Federal Reserve Bank of Atlanta:  Conference on Racial Inequality and Disparities in
  Financial Markets, Commentator on *Hidden Performance:  Salary History Bans and Gender
  Pay Gap*, October 2021
- European Association of Law & Economics, *Informative Wages, Salary History Bans, and the
  Gender Wage Gap*, September 2021
- University of Texas Law Review Symposium:  Governance Wars, *The Promise of Corporate
  Diversity, Inclusion & Punishment in Corporate Governance*, January 2021
- University of Texas McCombs School of Business, Conference on Regulation Best Interest,
  Moderator for *How will the rules impact the use of technology in delivering advice?*, February
  2020
- Texas Law Review Symposium, Moderator for *Remedies in Complex Litigation*, January
  2020
- UCLA Securities and Corporate Law Conference, *Banker Mobility and Long-Term
  Compensation*, October 2019
- American Law and Economics Association Annual Meeting, *Salary History Bans and the
  Gender Wage Gap*, May 2019
- Northwestern Law School Faculty Colloquium, *Salary History Bans and the Gender Wage
  Gap*, January 2019
- Law & Economic Theory Annual Conference, *Salary History Bans and the Gender Wage
  Gap*, December 2018
- Sixth Annual Corporate and Securities Litigation Conference, *Insider Trading and the
  Coasian Firm, Revisited*, October 2018
- Loyola Annual Institute for Investor Protection Roundtable Conference:  Lehman 10 Years
  Later—Lessons Learned?, *Reputational-related (Mis)Statements – Actionable or
  Aspirational?*, September 2018

- American Law and Economics Association Annual Meeting, *Optimal Deterrence When Shareholders Desire Fraud*, May 2018
- Fifth International Conference in Law and Economics, *Optimal Deterrence When Shareholders Desire Fraud*, April 2018
- AALS Section on Law & Economics Annual Meeting, *Misreporting and Compensation under Incomplete Commitment*, January 2018
- USC Corporate Law and Social Science Workshop, *Optimal Deterrence When Shareholders Desire Fraud*, November 2017
- Fifth Annual Corporate and Securities Litigation Conference, *Optimal Deterrence When Shareholders Desire Fraud*, October 2017
- Fourth International Conference in Law and Economics, *We Have a Consensus on Fraud on the Market – and It's Wrong*, June 2017
- American Law and Economics Association Annual Meeting, *We Have a Consensus on Fraud on the Market – and It's Wrong*, May 2017
- Law & Economic Theory Annual Conference, *Long-Term Incentives to Underperform in the Short Term*, December 2016
- Harvard Law School Law & Economics Workshop, *We Have a Consensus on Fraud on the Market – and It's Wrong*, September 2016
- Canadian Law & Economics Association Annual Meeting, *We Have a Consensus on Fraud on the Market – and It's Wrong*, September 2016
- National Business Law Scholars Annual Meeting, *We Have a Consensus on Fraud on the Market – And It's Wrong*, June 2016
- Midwest Finance Association Annual Meeting, *Long-term Incentives to Underperform in the Short Term*, March 2016
- Federalist Society Academic Section, *Some Fallacies in the Securities Law Literature, and Why We Should Care About Them*, January 2016
- European Association of Law and Economics Annual Meeting, *Long-term Incentives to Underperform in the Short Term*, September 2015
- European Assocation of Law and Economics Annual Meeting, *Structural Implications of the European Banking Union*, September 2015
- Duke University School of Law, *Less Agency Cost, More Long Term Compensation… and More Fraud?*, November 2014
- European Association of Law and Economics Annual Meeting, *Reputation and Corporate Fraud*, September 2014
- National Business Law Scholars Conference, *Reputation and Corporate Fraud*, June 2014
- American Law and Economics Association Annual Meeting, *Why Bank Regulation Failed and Will Continue to Fail*, May 2014
- US Markets Texas Institutional Investor Forum, *What U.S. Funds Need to Know About Shareholder Actions in the United States and Beyond*, November 13, 2013
- European Association of Law and Economics Annual Meeting, *Why Bank Regulation Failed and Will Continue to Fail*, September 2013
- European Association of Law and Economics Annual Meeting, *More Long Term Compensation and… More Fraud?*, September 2013
- Austin Bar Association Section on Business, Corporate and Tax, *Recent Trends in Mergers and Acquisitions*, June 2013
- American Law and Economics Association Annual Meeting, *More Long Term Compensation and … More Fraud?*, May 2013
- University of Texas Mergers and Acquisitions Institute, *Recent Trends in Mergers and Acquisitions*, October 2012
- National Business Law Scholars Conference, *More Long Term Compensation and… More Fraud?*, June 2012
- Global Finance Conference, *Hidden Costs of Long Term Compensation,* May 2012
- Section on Securities Regulation:  Annual Meeting of the American Association of Law Schools, *Hidden Costs of Mandatory Long Term Compensation*, January 2012

- Tel Aviv Law School and Journal of Theoretical Inquiries in Law Conference:  Back to the State, *Mandatory Long Term Compensation for Banks – and Beyond?*, June 2011
- Canadian Law and Economics Association, *Endogenous Compensation in a Firm with Disclosure and Moral Hazard*, October 2010
- University of Chicago Law School Faculty Workshop, *The Effects of Managerial Short-termism on Compensation, Effort, and Fraud*, May 2010
- Conference of Empirical Legal Studies, *IPO Underpricing, Disclosure, and Litigation Risk*, November 2009
- University of Virginia Law & Economics Workshop, *IPO Underpricing, Disclosure, and Litigation Risk,* October 2009
- Kauffman Foundation Summer Legal Institute, *The Future of Capital Markets Regulation,* July 2009
- Stanford/Yale Junior Faculty Forum, *Vicarious Liability for Securities Fraud*, May 2009
- USC Conference on Financial Law and Innovation, *IPO Underpricing and Prospectus Disclosure*, May 2009
- American Law and Economics Association Annual Meeting, *IPO Underpricing and Prospectus Disclosure*, May 2009
- European Financial Management Association Symposium on Corporate Governance, *Vicarious Liability for Securities Fraud*, April 2009
- 21st Annual Australasian Finance Association Meeting, *Vicarious Liability for Securities Fraud*, December 2008
- Stanford Law & Economics Workshop, *Vicarious Liability for Bad Corporate Governance: Are We Wrong About 10b-5?*, November 2008
- Canadian Law and Economics Association, *Vicarious Liability for Securities Fraud*, September 2008
- Kauffman Foundation Summer Legal Institute, *Innovation and Securities Law:  Vicarious Liability for Securities Fraud*, July 2008
- American Law and Economics Association Annual Meeting, *Vicarious Liability for Bad Corporate Governance:  Are We Wrong About 10b-5?*, May 2008
- University of Chicago Law & Economics Workshop, *Vicarious Liability for Bad Corporate Governance:  Are We Wrong About 10b-5?*, April 2008
- Financial Lawyers' Conference, *Securities Law Issues for Financial and Bankruptcy Lawyers*, April 10, 2008
- Berkeley Center for Law, Business, and the Economy, Corporate Roundtable, *Commentator on  Grundfest and Bochner, Fixing 404*, April 2007
- American Association of Law Schools Annual Meeting, *Why Shareholders Want Their CEOs to Lie More after* Dura Pharmaceuticals, January 2007
- American Law and Economics Association Annual Meeting, *Conflict or Credibility:  Analyst Conflicts of Interest and the Market for Underwriting Business*, May 2006
- USC Summit on Corporate Governance, *The Global View:  Convergence of International Corporate Governance Standards*, March 2006
- USC Marshall School of Business Executive Education Program, *State Fiduciary Duties and Recent Developments in Federal Law*, February 2006 (with Eric Talley)
- American Law and Economics Association Annual Meeting, *IPO Liability and Entrepreneurial Response*, May 2005
- Harvard Law and Finance Workshop, *IPO Liability and Entrepreneurial Response*, February 2005
- Directors Roundtable, *Panel on the Revolution in Investment Management*, April 28, 2004
- Directors' Roundtable, *Panel on SEC Enforcement and Disclosure*, December 3, 2003

## CONSULTING AND EXPERT WITNESS ENGAGEMENTS

Consultant and/or expert witness in approximately 60 matters involving corporate governance,

corporate finance, fiduciary duties, agency, commercial transactions, executive compensation, securities trading, securities fraud, broker-dealers, investment advisers, banking, and damages.

Trial, deposition, and/or arbitration testimony provided in:

- *Ralph S. Janvey, in his capacity as court-appointed receiver for the Stanford Receivership Estate, v. Daniel Bogar, Osvaldo Pi, and Bernerd Young*, Case No. 3:14-cv-3635, United States District Court, Northern District of Texas (deposition)
- *Fox v. Biomedical Enterprises et al.*, Cause No. 2010-CI-20399, Bexar County District Court, Texas (deposition)
- *Italian Investors, LLC, et al. v. Michael McGehee, et al.*, Cause No. DC-13-07398, 68th Judicial District, Dallas, Texas (deposition)
- *NEC Networks and Chris Hotchkiss v. AME & FE Investments Ltd. and Chris Erck*, Cause No. 2012-CI-11952, 73rd Judicial District Court, Bexar County, Texas (deposition and trial)
- *Seaman v. Wykidal*, JAMS binding arbitration, Irvine, CA (deposition and arbitration)
- *Tesoro Refining v. National Union Fire Insurance*, SA-13-00931-DAE, United States District Court, Western District of Texas (deposition)
- *AerReach Aero Space Solutions, LLC and Robert V. Hogan v. Chad G. Stanford et al.*, Cause No. DC-16-07714, District Court, 298th Judicial District, Dallas County, Texas (deposition)
- *Ralph S. Janvey, in his capacity as court-appointed receiver for the Stanford Receivership Estate, et al. v. Patricia Maldonado,* Civil Action No. 3:14-CV-02826-N-BG, United States District Court, Northern District of Texas, Dallas Division (deposition and trial)
- *Ralph S. Janvey, in his capacity as court-appointed receiver for the Stanford Receivership Estate, v. Proskauer Rose, LLP, Chadbourne & Parke, LLP, & Thomas V. Sjoblom*, Civil Action No. 3:13-cv-00477-N, United States District Court, Northern District of Texas, Dallas Division (deposition)
- *Firefighters' Retirement System, et al., v. Citco Group Limited et al.*, Civil Action No. 13-cv-00373-SDD-SCR, United States District Court, Middle District of Louisiana (deposition)
- *Horn & Hamrick v. Agave Natural Resources et al.*, JAMS Arbitration, San Antonio, TX (deposition and arbitration)
- *Ralph S. Janvey, in his capacity as court-appointed receiver for the Stanford Receivership Estate, v. Greenberg Traurig*, Civil Action No. 3:12-cv-04641-N, United States District Court, Northern District of Texas (deposition)
- *Thompson Petroleum Corporation and J. Cleo Thompson and James C. Thompson, Jr., L.P. v. Frank Peterman and Paul Rudnicki*, Cause No. DC-18-00644, District Court of Dallas County, Texas, 68th Judicial District (deposition)
- *SH 130 Concession Company, LLC, v. Central Texas Highway Constructors, LLC, et al.*, Case No. 18-01030, United States Bankruptcy Court, Western District of Texas, Austin Division (deposition)
- *Official Stanford Investors Committee v. Trustmark National Bank, HSBC Bank, The Toronto-Dominion Bank, Independent Bank f/k/a Bank of Houston, SG Private Banking (Suisse) S.A., and Blaise Friedli*, Case No. 3:09-CV-02384-N, United States District Court, Northern District of Texas (deposition)
- *Cox Operating, L.L.C. v. Wells Fargo Bank, N.A.*, Civil Action No. 4:19-cv-01889, U.S. District Court, Southern District of Texas, Houston Division (deposition)
- *Drivetrain, LLC v. Thomas S. Hall et al.*, C.A. No. 2019-0365-JTL, Court of Chancery of the State of Delaware (deposition)

**PROFESSIONAL AFFILIATIONS AND OTHER ACTIVITIES**

Member of the Bar of the State of New York, admitted December 11, 2000

Member, American Law & Economics Association

Member, American Economic Association

Referee or Section Reviewer:
Journal of Law, Economics, and Organizations
Journal of Legal Studies
American Law & Economics Review
Society of Empirical Legal Studies
International Review of Law and Economics
European Journal of Law and Economics
American Association of Law & Economics

Austin Rugby Club

## EXHIBIT B

**Depositions**
Deposition of Kevin Owens, dated Feb. 11, 2022 and Exhibits
Deposition of George DeReese, dated Jan. 18, 2022 and Exhibits
Deposition of Ryan Downton, dated April 7, 2022
Deposition of Peggy Borgfeld, dated Feb. 22, 2022 and Exhibits
Deposition of Jeff Madison, dated Feb. 10, 2022 and Exhibits
Deposition of Chapter 7 Trustee, dated March 11, 2022 and Exhibits

**Other Documents**
Amended and Restated Company Agreement of Little River Healthcare Holdings, LLC
dated March 31, 2015
Credit Agreement dated March 31, 2015
Expert Report of Saul Solomon, dated April 4, 2022
Expert Report of Mark Herbers in BCBSTX Arbitration
Expert Report of J. Michael Hill, Jr. in BCBSTX Arbitration
Defendants' March 25, 2022 Mixed Discovery Responses
Order Confirming Arbitration Award and BCBSTX Arbitration Award
Jan. 20, 2022 Department of Justice Press Release, *Seven Texas Doctors and a
Hospital CEO Agree to Pay over $1.1 Million to Settle Kickback Allegations*
March 22, 2022 Department of Justice Press Release, *Ten Texas Doctors and a
Healthcare Executive Agree to Pay over $1.68 Million to Settle Kickback
Allegations*
Complaint, *United States of America v. Grottenhaler et al*, Civil Action No. 4:16-CV-547,
U.S.   District Court, Eastern District of Texas, filed January 31, 2022.

BORGFELD 000228
BORGFELD 00234
BORGFELD 00494

DOWN 00061
DOWN 00408
DOWN 00586.1
DOWN 00597
DOWN 00787.1

MADI-00116
MADI-00119
MADI-00154
MADI-00156
MADI-00203
MADI-00236

INT 0000203856 (Owens 2019 Form 1040)
INT 0000203858 (Owens 2018 Form 1040)

INT 0000203860 (Owens 2016 Form 1040)
INT 0000203861 (Owens 2017 Form 1040)


P 0058709 [INT0000004825]
P 0058711 [INT0000004825.0001]
P 0058715 [INT0000004825.0002]
P 0058723 [INT0000007042]
P 0058999 [INT0000010374]
P 0059503 [INT0000025607]
P 0059994 [INT0000041068]
P 0059996 [INT0000041068.0001]
P 0060138 [INT0000041577]
P 0060474 [INT0000064538]
P 0060476 [INT0000064538.0001]
P 0060811 [INT0000073188]
P 0060825 [INT0000073269]
P 0060839 [INT0000073310]
P 0060847 [INT0000073357]
P 0060853 [INT0000073442]
P 0060898 [INT0000084057]
P 0060866 [INT0000074207]
P 0060870 [INT0000074228]
P 0060873 [INT0000074522]
P 0060964 [INT0000114254]
P 0060946 [INT0000111219]
P 0060947 [INT0000111219.0001]
P 0060948 [INT0000112045]
P 0060951 [INT0000112045.0001]
P 0060952 [INT0000112432]
P 0060954 [INT0000112432.0001]
P 0060925 [INT0000109214]
P 0060932 [INT0000109256]
P 0060989 [INT0000125112]
P 0060934 [INT0000109832]
P 0060955 [INT0000112866]
P 0060938 [INT0000110461]
P 0060940 [INT0000110461.0001]
P 0060995 [INT0000126670]
P 0061003 [INT0000126690]
P 0060970 [INT0000119012]
P 0060972 [INT0000119012.0001]
P 0061012 [INT0000129135]
P 0061018 [INT0000139069]
P 0061252 [INT0000144944]
P 0061264 [INT0000145647]
P 0061268 [INT0000145691]

P 0061272 [INT0000146547]
P 0061274 [INT0000146547.0001]
P 0061275 [INT0000146654]
P 0061277 [INT0000146654.0001]
P 0061278 [INT0000146835]
P 0061395 [INT0000167171]
P 0061396 [INT0000167598]
P 0061392 [INT0000166679]
P 0061446 [INT0000183088]
P 0116862 [INT0000193330]
P 0116863 [INT0000193330.0001]
P 0082932 [INT0000004442]
P 0011859 [INT 0000002543.0001]
P 0011860 [INT 0000002543.0002]
P 0011858 [INT 0000002543]
P 0043742 [INT 0000103862]
P 0043744 [INT 0000103862.001]
P 0083633 [INT 0000049326.0001]
P 0083634 [INT 0000049326.0002]
P 0083639 [INT 0000049326.0003]
P 0083631 [INT 0000049326]
P 0104575 [INT 0000124306]
P 0104580 [INT 0000124313.001]
P 0104579 [INT 0000124313.002]
P 0104579 [INT 0000124313]
P 0042223 [INT 0000096205]
P 0043612 [INT 0000103778]
P 0043615 [INT 0000103780]
P 0043620 [INT 0000103781]
P 0060985 [INT 0000124103]
P 0042356
P 0042358
P 0043189
P 0043191
P 0043728
P 0043733
P 0043735
P 0043736
P 0043738
P 0057759
P 0057760
P 0060739
P 0110459
P 0116986
P 0116994
P 0116996
P 0117124

P 0117259
P 0117263
P 0117270

INT 0000003219.002
INT 0000004442.001
INT 0000144651